1  DENNIS K. BURKE
   United States Attorney
2  District of Arizona

3  DAVID A. PIMSNER
   Assistant U.S. Attorney
   Arizona State Bar No. 007480
4  Two Renaissance Square
   40 N. Central Avenue, Suite 1200
   Phoenix, Arizona 85004-4408
5  Telephone (602) 514-7500
   david.pimsner@usdoj.gov

_____ FILED _____ LODGED
_____ RECEIVED _____ COPY

MAY 2 7 2011

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| United States of America, | |
|---|---|
| Plaintiff, | Case No. 11-7234 M |
| v. | **AUSA AFFIDAVIT IN SUPPORT OF REQUEST FOR EXTRADITION OF AHMAD IBRAHIM AL-AHMAD** |
| Ahmad Ibrahim Al-Ahmad, | |
| Defendant. | |

**SEALED**

**AFFIDAVIT OF DAVID A. PIMSNER**

I, DAVID A. PIMSNER, being duly sworn, depose and state:

1.     I am a citizen of the United States of America, and a resident of the state of Arizona.

2.     I am an Assistant U.S. Attorney in the U.S. Attorney's Office for the District of Arizona. As an Assistant U.S. Attorney for the District of Arizona, I am responsible for the preparation and prosecution of criminal cases. My duties are to prosecute persons charged with criminal violations of the laws of the United States.

3.     This affidavit is submitted in support of the United States of America's request for extradition of Ahmad Ibrahim Al-Ahmad (Al-Ahmad) from the country of Turkey to the United States to face criminal charges of Conspiracy to Commit Extraterritorial Murder of a United States National and for Providing Material Support to Terrorists in the District of Arizona as alleged in the criminal complaint filed May 10, 2011.

4.     This case arose from an investigation by the United States Federal Bureau of Investigation. The investigation revealed that beginning in January 2005, Al-Ahmad supplied component parts for improvised explosive devices to members and associates of the 1920

1  Revolution Brigades (Brigades), an Iraqi insurgent group that has claimed responsibility for
2  approximately 230 improvised explosive device attacks, 156 shelling attacks, and 82 sniper
3  and small arms attacks targeting United States military personnel from 2005 to 2010. The
4  parts supplied by Al-Ahmad were used in improvised explosive devices that were employed
5  against United States military personnel in Iraq. Al-Ahmad was also involved in the research
6  and development of new technologies and methods for the manufacture of improvised
7  explosive devices that were also used against United States military personnel.
8  5.      Under the laws of the United States a criminal prosecution may be originally initiated
9  by a federal agent through the filing of a complaint or commenced by a grand jury through its
10  return of an indictment. When a complaint is filed, an arrest warrant is issued and the
11  defendant must be indicted by the grand jury within 30 days of arrest. If the defendant is not
12  found and arrested, he may be indicted at any time. The formal charging instrument required
13  before all trials is a grand jury indictment. A grand jury is composed of at least sixteen (16)
14  citizens of the United States whom the United States District Court selects at random from
15  the residents of the judicial district where the crime was committed, in this instance the
16  District of Arizona. The grand jury is part of the Judicial Branch of the Federal Government.
17  The purpose of the grand jury is to independently review evidence of crimes as presented by
18  United States law enforcement authorities. After reviewing this evidence, each member of
19  the grand jury must determine and vote on whether there is probable cause to believe that a
20  crime has been committed and probable cause to believe that the particular defendant named
21  in the indictment committed the crime. If at least twelve (12) grand jurors affirmatively vote
22  that there is probable cause to believe that the defendant committed the crimes listed in the
23  indictment, the indictment containing the formal charges is returned. An indictment is thus
24  the formal written document that charges the defendant with the crimes and describes the
25  specific laws that the defendant is charged with violating as well as a brief description of the
26  acts of the defendant that are alleged to be violations of the law. After the indictment is
27
28

returned, warrants for the arrest of the defendant's named in the indictment are issued by the United States District Clerk at the direction of the United States District Judge.

6.     A complaint and warrant were  filed against Ahmad Ibrahim Al-Ahmad on May 10, 2011, in Case Number 11-7234 M.

7.     It is the practice of the United States District Court for the District of Arizona to retain the original complaints, indictments, and warrants and file them with the records of the court maintained by the clerk of the court or his deputy.  Therefore, I have obtained certified copies of these documents and have attached them as Exhibits A through B to this affidavit.

8.     In Case Number 11-7234 M, Ahmad Ibrahim Al-Ahmad is charged with the following crimes:

| Counts | Name of Offense | Statute | Maximum Penalties |
|---|---|---|---|
| 1. | Conspiracy to Commit Extraterritorial Murder of a United States National | 18 U.S.C. § 2332(b)(2) | Life Imprisonment and $250,000 Fine, or both. |
| 2. | Providing Material Support to Terrorists | 18 U.S.C. § 2339A | Life Imprisonment and $250,000 Fine, or both. |

9.     The first count in the indictment charges Al-Ahmad with conspiracy to commit extraterritorial murder of a United States national.  The Government must establish each of the following elements beyond a reasonable doubt:

        a. First, that two or more persons entered into a conspiracy, the object of which was to murder a national of the United States.  A "national of the United States" is a citizen of the United States or a person owing permanent allegiance to the United States.  A conspiracy is an agreement made or entered into by at least two people to violate the law by some common plan or course of action.  The agreement or understanding need not be formal, written, or even expressed directly in every detail.  The Government, however, must prove beyond a reasonable doubt that those who were involved shared a general understanding about the crime.  Mere similarity of conduct among various people or the fact that they may have

1  associated with each other or discussed common aims and interests does not necessarily

2  establish proof of the existence of a conspiracy, but may be considered in determining

3  whether a conspiracy existed and whether the defendant participated in it.

4  　　b.  Second, that the defendant knowingly and voluntarily became a member of the

5  conspiracy, with the intent to further its unlawful purpose.  The Government must show that

6  the defendant voluntarily joined in the agreement with an awareness of at least some of the

7  basic aims and purposes of the unlawful agreement and an intent to further them, and that he

8  was also aware that the conduct contemplated by the scheme was wrongful or unlawful.  The

9  Government need not show that the defendant was aware of every detail of the agreement or

10  even the identity of the other parties to the agreement.  The defendant need not have joined in

11  all of the conspiracy's unlawful objectives.  Nor is it necessary that the defendant receive any

12  monetary benefit from participating in the conspiracy or have any financial stake in the

13  outcome.  Rather, the Government must prove beyond a reasonable doubt that the defendant

14  willfully joined in the agreement - that is, that he was aware of and intended to further its

15  objectives and appreciated their unlawful or wrongful nature.

16  　　c.  Third, that the defendant engaged in the conspiracy while outside the United States.

17  It does not matter if you find that the defendant, in addition to his participation outside the

18  United States, also participated in that conspiracy while in the United States.  The term

19  "United States" includes all the states, territories, and possessions of the United States, and

20  all places and waters subject to the jurisdiction of the United States.

21  　　d.  Fourth, that one or more of the conspirators knowingly committed an overt act to

22  effect the object of the conspiracy.  To commit an overt act in furtherance of an object of a

23  conspiracy, a participant need not undertake a course of action that is certain or even likely to

24  result in the success of the conspiracy.  The law does not require that the act in question be

25  likely to yield an illegal result, or that the act in question even be prohibited by law.  Instead,

26  the Government must prove that a participant in the conspiracy undertook some action for the

27  purpose of furthering an object of the illegal agreement.

28  　　　　　　　　　　　　　　　　　　　　　　　4

i. For the Government to meet its burden with respect to this element, the defendant need not have personally engaged in an act in furtherance of the conspiracy. In fact, the defendant need not have known that another participant did something to further an object of the conspiracy, or even have known the identity of the participant that undertook the act in question. The Government is also not required to show that the act in question actually succeeded in furthering the objectives of the conspiracy. Rather, for the Government to meet its burden it must prove beyond a reasonable doubt that any one of the participants in the conspiracy in which the defendant was a party committed an act to further an object of the conspiracy.

ii. However, the Government must prove beyond a reasonable doubt that the act in furtherance of the conspiracy took place during the existence of the illegal agreement. An act undertaken by a participant in a conspiracy after the agreement has been terminated is insufficient to meet the Government's burden with respect to this element.

10. The second count in the indictment charges Al-Ahmad with providing material support to terrorists. To satisfy its burden of proof, the government must establish each of the following elements beyond a reasonable doubt:

a. First, that the defendant provided material support or resources. For the purposes of this element, the phrase "material support or resources" includes any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, and transportation. It does not include medicine or religious materials. The term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge. The term "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.

b. Second, that the defendant did so knowing or intending that such support or resources would be used in preparation for or in carrying out the conspiracy to commit

5

extraterritorial murder of a United States national, in violation of 18 U.S.C. § 2332(b). Specifically, the Government must prove that the defendant knew that the material support or resources would be used either in preparation for or in carrying out the conspiracy to commit extraterritorial murder of a United States national, in violation of 18 U.S.C. § 2332(b). The Government does not have to prove that the defendant knew any particular statute would be violated; instead, the Government must prove that the defendant knew or intended that his actions would result in the type of conduct forbidden under the statute.

11.    The text of all relevant statutes is attached as Exhibit C.

**Factual Summary**

12.    On August 30, 2006, Coalition Forces discovered one of the largest improvised explosive device (IED) caches in Iraq (hereinafter "Omar Cache") at 50 Omar Street, Baghdad, Iraq. At that site, U.S. military personnel found numerous IED-related construction materials, test equipment, schematics, and other items related to IED construction – including an IED initiator, hundreds of components for various types of Radio Controlled IEDs and extensive bomb making training aids. Also found were internet printouts bearing Al-Ahmad's name which featured diagrams and instructions on the process of wiring and controlling a fixed or cellular telephone and documents with electrical and electronics equipment diagrams featuring transistor connections. An analysis of the items seized from the Omar Cache indicated that the location was essentially an IED factory.

13.    Al-Ahmad, while not present at the time of the discovery, was later linked to the Omar Cache by various evidence found there. Copies of known fingerprints belonging to Al-Ahmad were sent to the FBI Laboratory in Quantico, Virginia, to conduct a comparative analysis with prints found at the Omar Cache. To date, the FBI Lab has found 114 matches to various items found at the Omar Cache. For example, Al-Ahmad's prints were identified on the following types of materials: documents and book pages; a voltage control oscillators in original packaging; a lid to a power meter; an unknown electronics device in light blue

metal case; and a piece of white electrical tape (the electrical tape was wrapped around an IED switch and a matching transmitter was also recovered with this device).

14.    Moreover, an analysis determined that materials of the kind seized at the Omar Cache were associated with IED attacks where U.S. Forces incurred casualties. For example, two attacks which were caused by RCIED initiators using a DTMF 11 custom circuit and a mobile phone are linked to the materials found in the Omar Cache. One incident used an initiator circuit that matched circuits recovered from the Omar Cache. The other incident used a circuit that is very similar to those found in the Omar Cache. On April 6, 2007, in the outskirts of southern Baghdad, near Baghdad International Airport, three U.S. soldiers were killed in action by a cellular phone initiated IED. The IED initiator used in this incident includes a DTMF 11 custom circuit that matched three circuits recovered in the Omar Cache. The circuits all have nearly identical traces, share a common set of electrical components, and function identically. Furthermore, the circuits were likely manufactured using the same processes. On May 14, 2007, in northern Baghdad, approximately one-half mile from the Omar Street facility, one U.S. soldier was killed in action and four wounded in action by a cellular phone initiated IED. The IED electronic switch used in this incident included a DTMF 11 custom circuit that was very similar to three custom circuits recovered in the Omar Cache. The custom circuits had subtle differences in their trace layouts, but otherwise used a common set of components and functioned identically.

15.    During a custodial interview, a cooperating witness who has agreed to testify, was shown a photograph of Al-Ahmad, whom he identified as "Ahmad." The cooperating witness indicated he met Al-Ahmad approximately six times, always in Baghdad, even though Al-Ahmad was originally from Syria. He also stated that in 2007, Al-Ahmad relocated to China, via Syria, with his wife and child and that, while in China, Al-Ahmad designed DTMF boards to remotely detonate IEDs and commissioned a Chinese factory to manufacture them. Al-Ahmad told the cooperating witness that he had designed the DTMF boards, and that he was selling them solely to the 1920 Revolution Brigades to assist in the

resistance against American Forces. The cooperating witness stated that Al-Ahmad was aware the DTMF boards were being used in IEDs against Americans. Al-Ahmad told the cooperating witness that he "would do anything against Americans" and explained the DTMF boards shipped by Al-Ahmad did not have any other purpose, or commercial value, other than being used to detonate IEDs. The cooperating witness advised he had seen a DTMF board early in 2007, when Al-Ahmad showed one to 1920 Revolution Brigades' members.

16.     Additionally, the investigation found contacts between Al-Ahmad and other individuals who were members or associates of the 1920 Revolution Brigades primarily located in Iraq and Syria. Many of the contacts involved Al-Ahmad supplying these individuals with components that could be used in the construction and operation of IEDs.

17.     The evidence of these crimes is outlined in more detail in Exhibit D, the affidavit of FBI Special Agent Dina L. McCarthy.

**Statute of Limitations**

18.     As death or serious physical injury occurred as a result of Al-Ahmad's criminal activity, according to 18 U.S.C. § 3286(b), there is no statute of limitations for the crimes with which he is charged. This means that formal charges may be filed at any time and no period of time will bar prosecution of these offenses. In this case, the offenses listed in the complaint are alleged to have taken place beginning in or about 2005 and continuing to in or about July 2010. The complaint was filed on May 10, 2011. The charges are not impacted by the lapse of time or any statute of limitations. The text of 18 U.S.C. § 3286 is attached as Exhibit E.

**Applicability of the Extradition Treaty**

19.     Violations of the laws of the United States, for which the defendants are charged, are offenses for which extradition may be granted under the laws of the United States and are

offenses considered as extraditable offenses within the meaning of Article 2 of the extradition treaty between the United States and Turkey, which entered into force on January 1, 1981.

**List of Exhibits**

20. The following are attached as exhibits to this affidavit:

| | |
|---|---|
| Exhibit A | Complaint in case number 11-7234 M |
| Exhibit B | Arrest Warrant in case number 11-7234 M |
| Exhibit C | Text of Relevant statutes of the offenses charged |
| Exhibit D | Affidavit of FBI Special Agent Dina McCarthy |
| Exhibit E | Text of the Statute of Limitations |

21. I believe that this affidavit and the attached exhibits establish proof of Ahmad Ibrahim Al-Ahmad's criminal activity in violation of the laws of the United States of America as alleged in the formal charges contained in the complaint. This affidavit is sworn to in the presence of a United States Magistrate Judge in the District of Arizona, United States of America, who is authorized to administer oaths.

DAVID A. PIMSNER
Assistant United States Attorney

I hereby certify that this is the original affidavit subscribed and sworn to before me on this _26_ day of May, 2011.

HONORABLE MICHELLE H. BURNS
U.S. Magistrate Judge
U.S. District Court for the District of Arizona

9

# EXHIBIT A

# UNITED STATES DISTRICT COURT

for the

District of Arizona

United States of America

v.

Case No. 11 - 7234 M

Ahmad Ibrahim Al-Ahmad

*Defendant*

(Filed Under Seal)

FILED ___ LODGED
___ RECEIVED ___ COPY

MAY 1 0 2011

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

## CRIMINAL COMPLAINT

I, Dina L. McCarthy, the complainant, state that the following is true to the best of my knowledge and belief.

On or about the date of January, 2005 and continuing to on or about July, 2010 in the County of Maricopa in the District of Arizona and elsewhere, the defendant committed the following violations:

### COUNT 1

Beginning in or about January, 2005 and continuing to on or about July, 2010, in the District of Arizona and elsewhere, defendant, Ahmad Ibrahim Al-Ahmad, and others both known and unknown, did knowingly combine, conspire, confederate, and agree together and with other persons to kill a national of the United States, while such national was outside the United States, with malice aforethought, in violation of 18 U.S.C. Section 2332(b)(2).

### COUNT 2

Beginning in or about January, 2005 and continuing to on or about July, 2010, in the District of Arizona and elsewhere, defendant, Ahmad Ibrahim Al-Ahmad, provided material support or resources knowing and intending that the support was to be used in preparation for and in carrying out a violation of 18 U.S.C. Section 2332(b)(2)(conspiracy to kill a United States national), all in violation of 18 U.S.C. Section 2339A.

This criminal complaint is based on these facts:

(See attached Statement of Probable Cause, which is incorporated herein.)

APPROVED BY    AUSA Michael T. Morrissey

*Complainant's signature*

Dina L. McCarthy, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   May 10, 2011

*Judge's signature*

Honorable James F. Metcalf
United States Magistrate Judge
*Printed name and title*

City and state:   Phoenix, Arizona

I hereby attest and certify on 5-11-11 that the foregoing document is a full, true and correct copy of the original on file in my office and in my custody.

CLERK, U.S. DISTRICT COURT
DISTRICT OF ARIZONA

By_____ Deputy

# STATEMENT OF PROBABLE CAUSE

I, Dina L. McCarthy, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1) I make this affidavit in support of an application for a criminal complaint against Ahmad Ibrahim Al-Ahmad (hereinafter "Al-Ahmad") for Conspiracy to Commit Extraterritorial Murder of a United States National, in violation of 18 U.S.C. § 2332(b)(2), and for Providing Material Support to Terrorists, in violation of 18 U.S.C. § 2339A.

2) I am a Special Agent with the Federal Bureau of Investigation (FBI) Phoenix Division. I have been employed in this capacity since approximately March 11, 2001. Prior to my employment with the FBI, I was a Military Intelligence Officer with the United States Army for approximately 10 years. I have been assigned to a counterterrorism (CT) squad for approximately 8 years.

3) I am a criminal investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. § 1515(4). In the course of my duties as a Special Agent with the FBI, I have investigated Federal crimes perpetrated by individuals against the U.S. Government. As a result of my training and experience, I have become familiar with the Federal laws relating to the Conspiracy to Commit Extraterritorial Murder, in violation of 18 U.S.C. § 2332(b)(2) and Providing Material Support to Terrorists, in violation of 18 U.S.C. § 2339A.

4) The facts in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation (including other

1

law enforcement officers, analysts, Arabic language specialists, subject matter experts, and U.S. Department of Defense personnel); my training and experience; and a review of public, commercial, law enforcement and U.S. Department of Defense records and reports. Because this affidavit is being submitted for the limited purpose of securing a criminal complaint for violations of 18 U.S.C. § 2332(b)(2), and § 2339A, my recitation of facts in support of a probable cause determination does not include each and every fact known to me concerning this investigation. Where statements of others are set forth in this affidavit, they are set forth in substance and in part.

5)    I am participating in the investigation of Al-Ahmad who your affiant submits supplied component parts to members and associates of the 1920 Revolution Brigades, an Iraqi insurgent group. These parts were then used in improvised explosive devices (IEDs) that were employed against United States soldiers in Iraq. Further, your affiant believes that Al-Ahmad was involved in the research and development of new technologies and methods for the manufacture of IEDs which were also used against United States soldiers. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that, beginning in or about 2005 and continuing to in or about July 2010, Al-Ahmad and others known and unknown, committed violations of 18 U.S.C. § 2332(b)(2), Conspiracy to Commit Extraterritorial Murder, and Providing Material Support to Terrorists, in violation of 18 U.S.C. § 2339A.

# LAW

## Conspiracy to Commit Extraterritorial Murder

### (18 U.S.C. § 2332(b)(2))

6)    Section 2332(b)(2) of Title 18 of the United States Code provides, in relevant part, that

> Whoever outside the United States . . . engages in a conspiracy to kill a
> national of the United States . . . that is a murder as defined in section §1111(a)
> of this title, if one or more of such persons do any overt act to effect the object
> of the conspiracy,

is guilty of a crime.

## Proving Material Support to Terrorists

### (18 U.S.C. § 2339A)

In addition, section 2339A of Title 18 of the United States Code provides, in relevant part, that

> Whoever provides material support or resources or conceals or disguises the nature,
> location, source or ownership of material support or resources, knowing or intending
> that they are to be used in preparation for, or in carrying out, a violation of [one or
> more listed federal offenses, including 18 U.S.C. §2332(b)]

is guilty of a crime.

## Elements of the Offenses

7)　　The Government must establish each of the following elements regarding the two foregoing offenses:

a.　　<u>18 U.S.C. § 2332(b)(2)</u>

<u>First</u>, that two or more persons entered into a conspiracy, the object of which was to murder a national of the United States;

<u>Second</u>, that the defendant knowingly and voluntarily became a member of the conspiracy, with the intent to further its unlawful purpose;

<u>Third</u>, that the defendant engaged in the conspiracy while outside the United States;

<u>Fourth</u>, that one or more of the conspirators knowingly committed an overt act to effect the object of the conspiracy.

b.　　<u>18 U.S.C. § 2339A</u>

<u>First</u>, the defendant provided material support or resources, or concealed or disguised the nature, location, source, or ownership of the material support or resources; and

<u>Second</u>, the defendant provided this material support or resources knowing or intending that they were to be used in preparation for, or in carrying out, a violation of [one or more listed federal offenses, including 18 U.S.C. §2332(b)].

8)　　A "national of the United States" is a citizen of the United States or a person owing permanent allegiance to the United States.[1] The term "material support or resources" means

---

[1] 8 U.S.C. § 1101(a)(22).

4

"any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials."[2]

## PROBABLE CAUSE

### I.    The 1920 Revolution Brigades

#### A.    Origins

9)    The 1920 Revolution Brigades (Kataib Thawrat al-Ishreen) ("the Brigades") is an armed Iraqi resistance group that opposes foreign presence in Iraq. During the height of the group's operational activities from approximately 2003 to 2007, the Brigades was among the more prominent jihadist groups in Iraq. According to a Brigades' publication, "Al-Kata'ib," the group's name dates back to the 1920 revolution when Iraqis revolted against the British occupation. The name was selected to remind Iraqis of their history of resistance against so-called occupation forces.

10)    On September 6, 2007, the Brigades announced that they joined eight other like-minded Iraqi armed factions in forming a unified front against the U.S.-led coalition under the name of "Jihad and Change Front (JACF)." In its first public statement, the JACF announced that it rejected the occupation and its consequences, including the political

---

[2] 18 U.S.C. §2339A(b)(1).

5

process, government, constitution, parties, and agreements. In a 2007 interview with the Al-Jazirah Satellite Channel, a spokesman for JACF and a representative of the Brigades noted that, among the reasons for forming the JACF, the resistance must fight as one rank and contended that the "coming stage" required a political council that represented all factions of the Iraqi resistance. The "coming stage" was likely a reference to the "post-occupation" stage following an expected draw down of U.S. forces.

### B. Goals

11) Communiqués published independently by the Brigades media office and jointly with the JACF media office from July 2003 to date, reflect that the goal of the Brigades and the JACF is to defeat all consequences of the U.S. presence, including the current political regime and process as it is viewed as an "occupation government." For example, in 2010, in a statement addressing the announced withdrawal of U.S. combat forces, the JACF media office declared that "…we will never quit fighting until the departure of the last foreign soldier from our soil." In a 2006 video message from the Amir (leader) of the Brigades to the Iraqi nation, the Amir proclaimed that the "American oppressor and tyrant has violated every place where humanity dwells and reserved his strong resentment and hatred for Islam and Muslims, destroying civilization of mankind and dragging behind every individual who echoes his barking." The Amir declared that "jihad today is a compulsory duty upon all of us." In 2009, the secretary general of the JACF announced that: "We are factions of a jihadist resistance. Our first enemy is the infidel U.S. occupation, those who came with it,

those who facilitated the occupation, supported it, and paved the way of its plan, and those who joined its rank against the resistance and jihad project."

## C. Targeting of U.S. Nationals by the Brigades/JACF

12)      From its inception to present day, the Brigades'/JACF's objective of resisting what they view as the "U.S. occupation" has translated into a campaign of violent hit-and-run attacks against U.S. forces by the Brigades and attempts to sway public opinion against the U.S. through negative media reports generated by the Brigades'/JACF's media wings.

13)      A review of press statements published by the Brigades and JACF that were posted to websites dedicated to news on jihad and Iraqi insurgent groups revealed that, from 2005 to 2010, the Brigades claimed responsibility for the killing and wounding of U.S. military personnel in premeditated attacks against U.S. military vehicles, bases, foot patrols, and aircraft. Press statements published by the Brigades reflect the group's use of Improvised Explosive Devices (IEDs) to target U.S. military vehicles and dismounted foot patrols; the use of mortars, rockets, and missiles to shell U.S. military bases and positions; and the use of snipers to shoot U.S. military personnel.

14)      According to its media wing, the Brigades claimed responsibility for approximately 230 IED attacks, 156 shelling attacks, 82 sniper and small arms attacks, and 45 non-specific attacks targeting U.S. military personnel from 2005 to 2010. In some instances these press statements were accompanied by video footage documenting the attacks. In a 2006 interview with the Al-Jazirah Satellite Channel, a Brigades spokesman affirmed that "we also have

7

many operations that are videotaped." Many of these videos show dramatic attacks on U.S. military vehicles which likely resulted in casualties to U.S. military personnel.

15) A review of press statements published by the Brigades from 2005 to 2010 finds that the Brigades also claimed responsibility for killing approximately 94 U.S. military personnel and wounding nine others. The Brigades also claimed responsibility for U.S. military personnel deaths and injuries in 92 separate attacks. While no specific numbers of deaths or injuries were cited in these 92 attacks, the press statements used phrases similar to "the Hummer was destroyed and all of those in it were killed or injured" or "sniped an American soldier" in their descriptions of the underlying events.

16) The following confirmed attacks on U.S. forces illustrates the Brigades' violent tactics. On July 20 and 22, 2006, two U.S. mounted combat patrols in Ramadi, Iraq, were attacked by IED strikes against "M1114 High Mobility Multipurpose Wheeled Vehicles" (a/k/a Hummers). A total of seven U.S. military personnel were wounded in both attacks and two Hummers were damaged. In an official press statement dated July 22, 2006, and posted to a website that carried statements issued by Iraqi insurgent groups, the 1920 Revolution Brigades stated that they had "destroyed two Hummers belonging to the occupying American forces in the western area of Al-Ramadi." A link to two videos of the operations accompanied the statements. The videos, containing the Brigades' logo, showed two Hummers sustaining direct hits from IED detonations.

## II. Improvised Explosive Devices (IEDs)

17)     Designed to destroy and incapacitate its target, an Improvised Explosive Device (IED) is a weapon placed or fabricated in an improvised manner incorporating destructive, lethal, noxious, pyrotechnic, or incendiary chemicals. It may incorporate military weaponry, but is normally devised from non-military components. Generally speaking, an IED can be broken down into five main components – a power source, a switch, an initiator, the main charge, and a container. The IED power source stores or releases energy, either mechanical or electrical, to initiate the IED. The IED switch controls the flow of energy from the power source to the initiator and can be the most complex component of the system. There are three main categories of IED switches: command, time, and victim-operated.

18)     A radio-controlled IED ("RCIED") provides a wireless method of IED initiation through the use of a transmitter and a matched receiver. RCIEDs recovered from the battlefield in Iraq include the following configurations: a mobile phone used as the receiver connected to a custom dual-tone multi-frequency (DTMF) circuit board to decode the incoming signals including Long Range Cordless Telephones (LRCTs);[3] a personal mobile radio (PMR) connected to a DTMF circuit board; a PMR connected to a transistor controlled relay (TCR); appliance controllers; wireless doorbells; keyless entry systems; and automobile

---

[3] Dual Tone Multi-Frequency signaling, which is commonly referred to as touch-tone dialing, sends information over a phone or audio connection. In many Improvised Explosive Devices (IEDs) that incorporate DTMF technology, the user calls a mobile phone attached to a custom circuit and explosive train. Using the phone's keypad the user sends a sequence of digits to detonate the IED. By using unique DTMF sequences or codes for their IEDs, terrorists are able to effectively control complex operations or prevent accidental predetonation. DTMF signaling is commonly used in IEDs because the technology is widely accessible, inexpensive, and simple to implement.

alarms.

### III. The "Omar Cache"

#### A. Inventory of Components/Tools/Boards/Chemicals

19) On August 30, 2006, Coalition Forces discovered at 50 Omar Street, Baghdad, Iraq, one of the largest IED caches found in Iraq ("Omar Cache"). The military personnel found numerous IED-related construction materials, test equipment, schematics, and other items related to IED construction – including an IED initiator, hundreds of components for various types of RCIEDs, and extensive bomb-making training aids. Also found were internet printouts bearing Al-Ahmad's name which featured diagrams and instructions on the process of wiring and controlling a fixed or cellular telephone and documents with electrical and electronics equipment diagrams featuring transistor connections. Computer-related material recovered from the site contained a collection of print-outs from extremist Islamic web sites. Al-Ahmad, while not present at the time of the discovery, was later linked to the Omar Cache by various evidence found there

20) An analysis of the items seized from the Omar Cache indicates that the location was essentially an IED factory. The cache included all of the necessary tools and materials for manufacturing Dual-Tone Multi-Frequency (DTMF) decoder custom circuits and also included documents with apparent design plans. The materials found at the Omar Cache could also have been used for modifying commercial electronics to function as low-power

RCIEDs and for manufacturing the DTMF-11[4] type of custom circuits which are commonly used as initiators in RCIEDs.

21) Some of the key items that indicated the cache likely served as an IED factory are listed below:

a.    Assorted documents, including a DTMF-11 circuit board layout, parts list, and datasheets – these documents are likely design notes for the manufacturing of IED electronics;

b.    Several sheets of blank, copper-clad boards – the boards are sent through a chemical etching process to produce custom circuit boards;

c.    Hydrochloric (muriatic) acid, hydrogen peroxide, and acetone – the hydrochloric acid and hydrogen peroxide form an etching solution, and the acetone is used as a cleaning agent in the process of producing custom circuit boards;

d.    Angle grinder and electric drill – these tools cut finished circuit boards from the sheet and make holes in the boards for mounting electronic components;

e.    Unpopulated, etched circuit boards – these boards represent the finished product of the etching and cutting process. Multiple types of unpopulated DTMF decoder custom circuits were recovered;

f.    Electronic components – all of the components needed to build DTMF-11 circuits were recovered in large quantities;

---

[4]    The number "11" refers to a specific DTMF circuit design.

g.     Soldering irons and solder – these items are used to mount electronic components to the circuit boards;

h.     Completed DTMF-11 circuits – there were at least six complete DTMF-11 circuits from the cache, which represented the finished product of the board manufacturing process;

I.     Mobile phones and Personal Mobile Radios (PMRs) – DTMF-11 circuits are commonly combined with these wireless devices to operate as receivers in RCIEDs.

22)     The items listed above were sufficient to produce approximately 60 DTMF-11 custom circuits. Notably, the cache included design documents, intermediate products (unpopulated circuit boards), and tools required for the manufacturing process. Such a collection indicates that the cache was not simply a storage site for IED-related materials, but that it was likely intended to build electronic IED switches (i.e., an IED electronics factory).

23)     In addition, the cache included circuitry for use in other types of RCIEDs, including many completed devices. The JDQ-6A radio controlled switches, YK1000, and YK1500 transmitters discovered at the cache are commonly used in low-power RCIEDs. The Remote Controlled (RC) toy car transmitter and receiver and Al Khateeb key fob transmitters found at the cache have low-power RCIED applications as well. The cache also included a DTMF-9 type of custom circuit and multiple Microchip PIC microcontrollers (key component for the DTMF-9 custom circuits). The cache could have been used to exploit commercial devices for use in low-power RCIEDs or to manufacture DTMF custom circuits.

Numerous documents clearly indicated that the individual(s) involved with the Omar Cache were interested in improving the functionality of the IED designs through incorporation of innovative technologies and advanced electronic components. For instance:

a.    Technical specifications for the TRW-400-5 transceiver – while this specific device has not been found in IEDs, similar devices operating at the same frequency have been employed in IED circuits in Iraq since June 2005. Al-Ahmad discussed this component since at least August 2005.

b.    Technical notes on dual-tone multiple-frequency (DTMF) technology used in touch-tone telephones – this technology was introduced in Iraqi IEDs in November 2005.

c.    Schematics and technical notes on IED design incorporating the Microchip PIC16F84A and a DTMF decoder chip. This design is typical of many IED circuits employed in Iraq. Microchip PIC16F84A is manufactured by Microchip Technology Inc., which is headquartered in Chandler, AZ, and is a leading provider of micro controller and analog semiconductors.

d.    Technical specifications of the Princeton Technologies PT2262 and PT2272 remote control devices. These components, like the Microchip PICI6F84A, have been used in RCIEDs in Iraq.

**B.    Al-Ahmad's Association with the Omar Cache**

24)    Copies of known fingerprints belonging to Al-Ahmad were sent to the FBI Laboratory in Quantico, Virginia, to conduct a comparative analysis with prints found at the Omar

Cache. To date, the FBI Lab has found 114 matches to various items found at the Omar Cache. For example, Al-Ahmad's prints were identified on the following types of materials: documents and book pages; voltage control oscillators in original packaging; a lid to a power meter; an unknown electronics device in a light blue metal case; and a piece of white electrical tape (the electrical tape was wrapped around an IED switch and a matching transmitter was also recovered with this device).

25) In addition, a collection of documents were seized from the Omar Cache which included the following: various photos of Ahmad Ibrahim Ahmad;[5] a handwritten document in Arabic with a translated title of "Explosives," comprising 19 chapters covering the classification and effects of various explosives, accessories used with explosives, detonation circuits, handling of explosives, demolition of buildings, bridges, airports, roads, etc., and timing devices; a voltage tester that is labeled "Al-Ahmad Manufacturing for Electronic Products" (it appeared that a small number of voltage testers were also being constructed at the Omar Cache); electronic circuit board designs and diagrams on micro-fiche slides which included a sticker for Al-Ahmadi electronics production warranty and an envelope with "Ahmad Al-Ahmadi" written on it containing an order of "neon board;" a notebook that had the name "Ahmad Al-Ahmad" written on the front from the Mustansriyyah University Nuclear lab; a second notebook that had the name "Ahmad Al-Ahmad" written on the front containing drawings of electrical circuits, circuit board designs, and formulas from the

_____

[5] It should be noted that some documents apparently belonging to other persons were also found at the Omar Cache.

14

"Al-Rafidayn" school. There was also a letter from 'Abd-al-Karim 'Amur to Ahmad Ibrahim Al-Ahmad; documents containing technical notes and lessons (in an "Al-Ahmad Electronics Industries" notebook) detailing electrical and electronic circuits, automotive sensors and wiring, batteries, frequencies, math calculations, current and voltage, and various electronic components; documents also included emails, sales receipts, letters, and personal statements; an electronics booklet describing how to employ remote control technology to command a mobile phone, wireless device, and land-line phone to detonate explosives.

26) The Omar Cache contained business documents linked to Al-Ahmad: a mix of papers including a letter between Ahmad Al-Ahmadi and another individual, diagrams, electronic calculations, time sheets, accounts, school confirmation for "Ahmad Ibrahim Al-Ahmad," cash receipts, electrical receipt, and a tax receipt. Documents included a cash receipt and order form for a neon sign for Ahmad Al-Ahmadi and a property sticker in the name of Ahmad Al-Ahmad. There were documents linking Al-Ahmad to the Beirut, Lebanon, company SES Lebanon (a/k/a Serpico Sarl). One undated letter to "Ahmad" from a principal of SES Lebanon, stated that the principal was arranging a shipment from an unidentified company in Hong Kong "by your account to Baghdad direct, signed [the principal]." A second undated letter from SES Lebanon to Wenshing Electronics in Taipei, Taiwan, concerning Wenshing model TRW-400 transmitter/receiver indicated Al-Ahmad, through SES Lebanon, was seeking samples of the item which had a range of more than one kilometer. Based on consultation with others who are subject matter experts in explosives,

your affiant knows that this type of transmitter/receiver could be used in an IED.

27)    As part of the investigation, an analysis determined that materials of the kind seized at the Omar Cache were associated with IED attacks in which U.S. Forces incurred casualties. For example, two attacks which were caused by RCIED initiators using a DTMF-11 custom circuit and a mobile phone are linked to the materials found in the Omar Cache. One incident used an initiator circuit that matched circuits recovered from the Omar Cache. The other incident used a circuit that is very similar to those found in the Omar Cache. On April 6, 2007, in the outskirts of southern Baghdad, near Baghdad International Airport, three U.S. soldiers were killed in action by a cellular-phone initiated IED. The IED initiator used in this incident includes a DTMF-11 custom circuit that matched three circuits recovered in the Omar Cache. The circuits all have nearly identical traces, share a common set of electrical components, and function identically. Furthermore, the circuits were likely manufactured using the same processes. On May 14, 2007, in northern Baghdad, approximately one-half mile from the Omar Street facility, one U.S. soldier was killed in action and four wounded in action by a cellular phone initiated IED. The IED electronic switch used in this incident included a DTMF-11 custom circuit that was very similar to three custom circuits recovered in the Omar Cache. The custom circuits had subtle differences in their trace layouts, but otherwise used a common set of components and functioned identically.

IV.    **Al-Ahmad's Involvement with the 1920 Revolution Brigades**

16

28)     During a custodial interview, W-1, who is currently facing trial for terrorism-related charges in Iraq, provided the following information about Al-Ahmad.[6]  W-1 was shown a photograph of Al-Ahmad, whom he identified as "Ahmad."  W-1 indicated he met Al-Ahmad approximately six times, always in Baghdad, even though Al-Ahmad was originally from Syria.  W-1 first met Al-Ahmad in either 2005 or 2006.  W-1 stated that in 2007, Al-Ahmad relocated to China, via Syria, with his wife and child.[7]

29)     W-1 stated that while in China, Al-Ahmad designed DTMF boards to remotely detonate IEDs and commissioned a Chinese factory to manufacture them.  Al-Ahmad told W-1 that he had designed the DTMF boards, and that he was selling them solely to the 1920 Revolution Brigades to assist in the resistance against American Forces.  W-1 acknowledged that Al-Ahmad was aware the DTMF boards were being used in IEDs against Americans.  Al-Ahmad told W-1 he "would do anything against Americans."  W-1 explained the DTMF boards shipped by Al-Ahmad did not have any other purpose, or commercial value, other than being used to detonate IEDs.

30)     W-1 advised he had seen a DTMF board early in 2007, when Al-Ahmad showed one to 1920 Revolution Brigades' members.  Upon being released from a prior detention in Iraq

---

[6]  W-1 was interviewed on a number of occasions between July and August 2010.

[7]  When initially questioned about Al-Ahmad, W-1 stated that Al-Ahmad was a Lieutenant for the Iraq Customs (IC).  W-1 claimed that he last saw Al-Ahmad in approximately 2006 at the Baghdad Custom Building and never telephonically or electronically contacted Al-Ahmad.  When he was re-interviewed, W-1 advised he wanted to correct information provided in prior interviews.  W-1 stated he specifically wanted to provide information regarding Al-Ahmad, residing in China, and Dual Tone Multi Frequency (DTMF) boards.  W-1 clarified Al-Ahmad was never a Lieutenant for the Iraqi Customs, but rather a member of the 1920 Revolution Brigades.  W-1 further clarified that W-1 had additional contacts with Al-Ahmad and asked that this information be considered so that W-1 and a family member might be released from custody.

in 2009, W-1 attempted to learn the design and programming of DTMF boards to profit from its sales to Brigades' members. Al-Ahmad provided W-1 with online instructions on how the boards functioned and how they could be rendered inoperable. W-1 found the programming to be too complicated and abandoned his efforts to make the boards.

31) W-1 and Al-Ahmad interacted via email communications. W-1 stated that he received an email containing scanned copies of Al-Ahmad's documents which he was supposed to use to expedite Ahmad's passport request. W-1 explained that, during his communications with Al-Ahmad, he learned about the frequency used by Al-Ahmad in his DTMF boards. W-1 stated that Al-Ahmad, approximately one and a half years ago, was troubled by a lack of payments from the Brigades for the DTMF boards. Al-Ahmad decided he would become strictly business oriented and he would provide the boards only upon full up-front payment.

32) Al-Ahmad told W-1 that the shipments of electronics to Iraq could be received via container, taking two months, or via air within one week. Al-Ahmad knew people at an unidentified Chinese airport who would facilitate the air shipment of illicit merchandise, but that the recipient of the shipment also required facilitation at the receiving airport.

33) W-1 acknowledged that C-6, described hereafter, was a member of the 1920 Revolution Brigades.

34) W-1 indicated that prior to W-1's July 2010 capture, Al-Ahmad inquired if C-6, of the 1920 Revolution Brigades, had been detained by Coalition Forces and what the underlying charges were. When C-6 was subsequently released, he tasked W-1 with contacting Al-

Ahmad and alerting him that Coalition Forces were aware of Al-Ahmad's activities. W-1 stated that he relayed the message to Al-Ahmad.

35) On March 17, 2011, W-1 was re-interviewed by the FBI in an Iraqi prison. During the interview, W-1 reaffirmed his earlier statements against Al-Ahmad concerning the use of DTMF boards in IEDs and the targeting of Coalition Forces in Iraq. W-1 agreed to testify and to continue cooperating with the United States government.

36) Al-Ahmad, after leaving Iraq, initially fled to Syria, and then in approximately 2007, moved to China. Al-Ahmad established various companies in China, with the support of a Chinese assistant, C-1. These companies appeared to function as exporters, whereby Al-Ahmad received orders for products that could be obtained in China for his associates located primarily in Iraq, Syria, Sudan, and Yemen. Al-Ahmad received the orders and arranged the purchase and shipment of these orders. Your affiant discovered that Al-Ahmad utilized many email addresses to conduct business and/or communicate with his associates worldwide. Moreover, C-1 also established email accounts, which were also used to facilitate Al-Ahmad's business. As described below, Al-Ahmad had contact with several individuals who were members or associates of the 1920 Revolution Brigades.

37) C-2 allegedly served as the political director and media emir for the 1920 Revolution Brigades as well as the Jihad & Change Front, and it is believed that he continues to serve in a leadership role. Based on my review of evidence gathered in this investigation, C-2 had the authority to oversee and approve the press releases that were publicly distributed on

19

behalf of these groups. For example, C-2 was sent a Brigades' magazine for review and approval, and C-2 interacted with members of the media on behalf of the Brigades. As such, C-2 provided updates on the groups goals and activities. C-2 also received operational updates from other members of the Brigades regarding attacks against U.S. forces in Iraq.

38)     Through a review of the available evidence, the investigation revealed that Al-Ahmad supplied C-2 with components that could be used in the construction and operation of IEDs. For example, on October 12, 2008, Al-Ahmad and C-2 corresponded concerning an order for mobile phones – three of the five types of mobile phone models listed in the message had been recovered in IED caches/events in Iraq. On August 20, 2007, C-2 requested an address to send the first half of the payment of $26,000 for 2,000 receivers. C-2 asked that another 100 hand units continue to be worked on. Based on training and experience and results of the investigation, your affiant believes that the receivers and hand held devices mentioned above were intended for use as part of the remote initiating systems for IEDs. In short, the investigation discovered that C-2, a senior leader with the Brigades, was ordering IED components from Al-Ahmad and transferring funds to his bank account in China as payment.

39)     C-3 allegedly is a mid-level leader with the 1920 Revolution Brigades. C-3 received operational updates from Brigades' forces in Iraq and had the authority to request and procure supplies and funding for them. C-3 also routinely received expense reports from other members of the Brigades for review and remittance. On or about November 11, 2008, Al-Ahmad shared information with C-3 regarding how to use a mobile phone as a

surveillance tool. On November 11, 2008, Al-Ahmad sent C-3 another message which included the phrases, "Receiving unit: 100 pieces," and "Transmitting unit: 10 pieces." Based on training and experience, your affiant believes that these phrases refer to receivers and transmitters that are part of the initiation systems of RCIEDs. On December 19, 2008, Al-Ahmad sent C-3 a message containing a list of four magnets with their dimensions. A quantity of 150 was listed for each magnet. Based on the dimensions included in the message, two of the magnets listed by al-Ahmad are similar to magnets recovered from IED attacks in Iraq. Iraqi insurgents are known to glue magnets to IED initiation systems, which makes it possible to attach those devices to U.S. vehicles.

40)     C-4 allegedly served as a mid-level leader within the 1920 Revolution Brigades who kept track of the group's operational expenses. C-4 communicated with other Brigades' leaders regarding funding issues and specific updates on losses sustained during operations in Iraq, along with requests for guidance. C-4 communicated with Al-Ahmad, on or about February 2, 2009, regarding a "Shipment List" that included a wireless transmitting unit, wireless receiving unit, and electronic boards. These items found in the list were consistent with components used in IEDs. On May 5, 2009, C-4 received information from Al-Ahmad regarding a DHL shipment containing two external car antennas, two range extending systems (25 watts), one transmission frequency measuring system, electric cables, metal conductors and accessories. Based on C-4's leadership role in the Brigades, your affiant believes that the components being shipped from Al-Ahmad in China to C-4 in Iraq are likely

being used in IEDs against U.S. military forces.

41)     C-5 allegedly is an IED distributor who operated out of the Baghdad area and who was connected to members of the 1920 Revolution Brigades. On or about April 9, 2009, C-5 shared an article with C-2, a senior leader of the Brigades, which discussed the different operations taken by the resistance to prevent the needed supplies of equipment to reach the American army in Kirkuk and Mosul. The article concluded that the supplies were destroyed and that they did not reach their destination. On January 12, 2008, C-5 sent a report to Al-Ahmad. The report was translated from Arabic to English and was titled, "A report about military operations in different parts of Iraq." The first paragraph discussed the decrease in activities of the resistance groups. The second paragraph discussed the activities of the Islamic Army, which was declared a jihadi front and not a resistance group. The third topic discussed Al-Kata'ib in Karkuk, advising that groups were suffering from the inability to develop new tactics of attack and that explosive systems were not efficient anymore.

42)     On August 9, 2009, C-5, using an alias, sent Al-Ahmad a request for POSITIV20 aerosol spray cans. C-5 asked Al-Ahmad to order the spray and "send it with the other stuff." Your affiant knows based on training and experience that this spray is used with custom circuit boards after production to prevent oxidation or other degradation of the circuits. On August 16, 2009, Al-Ahmad sent C-5 his bank account information for two accounts in China. Shortly thereafter, C-1 sent C-5 an invoice for electronics equipment and separately the technical user manuals of the Shenzhen KYL RF modules listed on the invoice.

43) C-6 was allegedly a major distributor of IED initiators in Iraq and a leader within the Brigades. Your affiant learned that C-6 corresponded directly with Al-Ahmad on at least one occasion and also through other individuals. On June 17, 2009, C-6 described himself as an "engineer" to Al-Ahmad. Your affiant knows, based on this investigation that the term "engineer" is commonly used to describe individuals in insurgent groups involved in constructing explosive devices.

44) On or about September 2, 2008, C-7 sent Al-Ahmad a list of components that consisted of 1,000 Microchip 16F630 integrated circuits (IC), 1,000 Microchip 16F628 integrated circuits (IC), 2000 MT8870 dual tone multi-frequency decoder circuits, 2,000 crystal oscillators that operated at 3.579545 MHZ, 2000 680 transistors, 2000 681 transistors, 4000 9v battery clips, 4000 4.7 muq (no further information), and an unspecified amount of finger magnets. Your affiant has learned that six of these nine components are commonly used in IED circuits employed by insurgents in Iraq. Based on the quantities of various components requested, the purchaser could construct 2,000 IED circuits (1,000 each of two different circuits). The component list also included "finger magnets" which are consistent with magnets that are used to attach IEDs to U.S. vehicles in Iraq.

## CONCLUSION

45) Based on the foregoing, there is probable cause to believe that, beginning in or about 2005 and continuing to in or about July 2010, Ahmad Ibrahim Al-Ahmad and others known and unknown committed the offenses of Conspiracy to Commit Extraterritorial Murder, in

violation of 18 U.S.C. § 2332(b)(2) and Providing Material Support to Terrorists, in violation of 18 U.S.C. § 2339A.

## REQUEST FOR SEALING

46)   It is respectfully requested that this Court order this Complaint and Statement of Probable Cause sealed, until further order of the Court.   Your affiant submits that sealing is necessary because disclosure would adversely and seriously jeopardize the ongoing investigation. Premature disclosure could give Al-Ahmad an opportunity to destroy evidence, notify confederates, and flee from prosecution.

Respectfully submitted,

DINA L. MCCARTHY
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on May _10_, 2011:

HONORABLE James F. Metcalf
United States Magistrate Judge

**EXHIBIT B**

# UNITED STATES DISTRICT COURT

for the

_____ District of Arizona _____

# AUSA

United States of America
         v.

Ahmad Ibrahim Al-Ahmad
_____
       *Defendant*

)
)
)
)
)

Case No. *11- 7234 M*  **SEALED**

## ARREST WARRANT

To:    Any authorized law enforcement officer

    **YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*   **Ahmad Ibrahim Al-Ahmad** _____,

who is accused of an offense or violation based on the following document filed with the court:

❐ Indictment    ❐ Superseding Indictment    ❐ Information    ❐ Superseding Information    **X Complaint**

❐ Probation Violation Petition    ❐ Supervised Release Violation Petition    ❐ Violation Notice    ❐ Order of the Court

This offense is briefly described as follows:
18:U.S.C. Section 2332(b)(2), Count 1
18:U.S.C., Section 2332(b)(2) (conspiracy to kill a United States national), all in violation of 18 U.S.C. Section 2339A., Count 2.

Honorable James F. Metcalf
_____
Name of Issuing Officer

_____

United States Magistrate Judge
_____
Title of Issuing Officer

May 10, 2011,  PHOENIX, ARIZONA
_____
Date           City/State

| Return |
|---|
|     This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |

Date: _____

_____
*Arresting officer's signature*

_____
*Printed name and title*

# EXHIBIT C

**Conspiracy to Commit Extraterritorial Murder of a United States National**
18 U.S.C. § 2332

. . . .

(b) Attempt or conspiracy with respect to homicide.--Whoever outside the United States attempts to kill, or engages in a conspiracy to kill, a national of the United States shall--

    (1) in the case of an attempt to commit a killing that is a murder as defined in this chapter, be fined under this title or imprisoned not more than 20 years, or both; and

    (2) in the case of a conspiracy by two or more persons to commit a killing that is a murder as defined in section 1111(a) of this title, if one or more of such persons do any overt act to effect the object of the conspiracy, be fined under this title or imprisoned for any term of years or for life, or both so fined and so imprisoned.

. . . .

**Murder**
18 U.S.C. § 1111

(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

**Providing Material Support to Terrorists**
18 U.S.C. § 2339A

(a) Offense.--Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section . . . .2332, . . . . . or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal

judicial district as provided by law.

(b) Definitions.--As used in this section--

    (1) the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

    (2) the term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and

    (3) the term "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.

# EXHIBIT D

DENNIS K. BURKE
United States Attorney
District of Arizona

DAVID A. PIMSNER
Assistant U.S. Attorney
Arizona State Bar No. 007480
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500
david.pimsner@usdoj.gov

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br> v.<br><br>Ahmad Ibrahim Al-Ahmad,<br><br>    Defendant. | Case No. 11-7234 M<br><br>**AFFIDAVIT OF DINA L. MCCARTHY, SPECIAL AGENT, FEDERAL BUREAU OF INVESTIGATION, IN SUPPORT OF REQUEST FOR EXTRADITION OF AHMAD IBRAHIM AL-AHMAD** |

## AFFIDAVIT OF DINA L. MCCARTHY

I, Dina L. McCarthy, being duly sworn, depose and state:

1.  I am a citizen of the United States of America, and residing in the State of Arizona.

2.  I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since March 2001. This affidavit is being submitted in support of the United States of America's request for the extradition of Ahmad Ibrahim Al-Ahmad ("Al-Ahmad") from Turkey to the United States.

**Factual Summary**

3.  During November 2009, the FBI began an investigation regarding the activities of Al-Ahmad.

4.  The investigation to date has revealed the following facts:

  a.  Al-Ahmad supplied component parts to members and associates of the 1920 Revolution Brigades, an Iraqi insurgent group. These parts were then used in improvised explosive devices (IEDs) that were employed against United States military personnel in Iraq.

Further, Al-Ahmad was involved in the research and development of new technologies and methods for the manufacture of IEDs which were also used against United States military personnel.

b. Beginning in or about 2005 and continuing to in or about July 2010, Al-Ahmad and others known and unknown, committed a violation of 18 U.S.C. § 2332(b)(2), Conspiracy to Commit Extraterritorial Murder and 18 U.S.C. § 2339A, Providing Material Support to Terrorists.

5. On August 30, 2006, Coalition Forces discovered at 50 Omar Street, Baghdad, Iraq, one of the largest IED caches found in Iraq ("Omar Cache"). Al-Ahmad, while not present at the time of the discovery, was later linked to the Omar Cache by various evidence found there, detailed more fully below. The military personnel found numerous IED related construction materials, test equipment, schematics, and other items related to IED construction – including an IED initiator, hundreds of components for various types of Radio Controlled IEDs[1] (RCIEDs), and extensive bomb making training aids. Also found were internet printouts bearing Al-Ahmad's name which featured diagrams and instructions on the process of wiring and controlling a fixed or cellular telephone and documents with electrical and electronics equipment diagrams featuring transistor connections.

6. The investigation revealed that an analysis of the items seized from the Omar Cache indicated that the location was essentially an IED factory. The cache included all of the necessary tools and materials for manufacturing Dual Tone Multi Frequency (DTMF) decoder custom circuits and also included documents with apparent design plans. The materials found at the Omar Cache could also have been used for modifying commercial electronics to function

---

[1] A radio-controlled IED ("RCIED") provides a wireless method of IED initiation through the use of a transmitter and a matched receiver. RCIEDs recovered from the battlefield in Iraq include a mobile phone used as the receiver connected to a homemade dual-tone multi-frequency (DTMF) circuit board to decode the incoming signals.

as low power RCIEDs and for manufacturing the DTMF 11[2] type of custom circuits which are commonly used as initiators in RCIEDs. Photographs of the cache are attached to this affidavit as Attachment 4.

7.     Some of the key items that indicated the cache likely served as an IED factory are listed below:

a.    Assorted documents, including a DTMF-11 circuit board layout, parts list, and datasheets – these documents are likely design notes for the manufacturing of IED electronics;

b.    Several sheets of blank, copper-clad boards – the boards are sent through a chemical etching process to produce custom circuit boards;

c.    Hydrochloric (muriatic) acid, hydrogen peroxide, and acetone – the hydrochloric acid and hydrogen peroxide form an etching solution, and the acetone is used as a cleaning agent in the process of producing custom circuit boards;

d.    Angle grinder and electric drill – these tools cut finished circuit boards from the sheet and make holes in the boards for mounting electronic components;

e.    Unpopulated, etched circuit boards – these boards represent the finished product of the etching and cutting process. Multiple types of unpopulated DTMF decoder custom circuits were recovered;

f.    Electronic components – all of the components needed to build DTMF-11 circuits were recovered in large quantities;

g.    Soldering irons and solder – these items are used to mount electronic components to the circuit boards;

h.    Completed DTMF-11 circuits – there were at least six complete DTMF-11 circuits from the cache, which represented the finished product of the board manufacturing process;

i.     Mobile phones and Personal Mobile Radios (PMRs) – DTMF-11 circuits are commonly combined with these wireless devices to operate as receivers in RCIEDs.

---

[2]  The number "11" refers to a specific DTMF circuit design.

3

8. The items found at the Omar Cache were sufficient to produce approximately 60 DTMF 11 custom circuits. Notably, the cache included design documents, intermediate products (unpopulated circuit boards), and tools required for the manufacturing process. Such a collection indicates that the cache was not simply a storage site for IED-related materials, but that it was likely intended to build electronic IED switches (i.e., an IED electronics factory).

9. In addition, the cache included circuitry for use in other types of RCIEDs, including many completed devices. The JDQ-6A radio controlled switches, YK1000, and YK1500 transmitters discovered at the cache are commonly used in low-power RCIEDs. The Remote Controlled (RC) toy car transmitter and receiver and Al Khateeb key fob transmitters found at the cache have low-power RCIED applications as well. The cache also included a DTMF-9 type of custom circuit and multiple Microchip PIC microcontrollers (key component for the DTMF-9 custom circuits). The cache could have been used to exploit commercial devices for use in low-power RCIEDs or to manufacture DTMF custom circuits. Numerous documents clearly indicated that the individual(s) involved with the Omar Cache were interested in improving the functionality of the IED designs through incorporation of innovative technologies and advanced electronic components. For instance:

a. Technical specifications for the TRW-400-5 transceiver – while this specific device has not been found in IEDs, similar devices operating at the same frequency have been employed in IED circuits in Iraq since June 2005. Emails belonging to Al-Ahmad in August 2005 discussed this component.

b. Technical notes on dual-tone multiple-frequency (DTMF) technology used in touch-tone telephones – this technology was introduced in Iraqi IEDs in November 2005.

c. Schematics and technical notes on IED design incorporating the Microchip PIC16F84A and a DTMF decoder chip. This design is typical of many IED circuits employed in Iraq.

d. Technical specifications of the Princeton Technologies PT2262 and PT2272 remote control devices. These components were used in IEDs prior to the Microchip PICI6F84A.

4

10.    After examining the IED components recovered from the Omar Cache, it was discovered that certain components were originally manufactured by a company headquartered in the United States, in the State of Arizona.

11.    Copies of known fingerprints belonging to Al-Ahmad were sent to the FBI Laboratory in Quantico, Virginia, to conduct a comparative analysis with prints found at the Omar Cache. Those fingerprints are attached to this affidavit as Attachment 2. To date, the FBI Lab has found 114 matches to various items found at the Omar Cache. For example, Al-Ahmad's prints were identified on the following types of materials: documents and book pages; a voltage control oscillators in original packaging; a lid to a power meter; an unknown electronics device in light blue metal case; and a piece of white electrical tape (the electrical tape was wrapped around an IED switch and a matching transmitter was also recovered with this device).

12.    In addition, a collection of documents were seized from the Omar Cache which included the following: various photos of Ahmad Ibrahim Ahmad; a handwritten document in Arabic with a translated title of "Explosives," comprising 19 chapters covering the classification and effects of various explosives, accessories used with explosives, detonation circuits, handling of explosives, demolition of buildings, bridges, airports, roads, etc., and timing devices; a voltage tester that is labeled "Al Ahmad Manufacturing for Electronic Products" (it appeared that a small number of voltage testers were also being constructed at the Omar Cache); electronic circuit board designs and diagrams on micro fiche slides which included a sticker for Al Ahmadi electronics production warranty and an envelope with "Ahmad Al Ahmadi" written on it containing an order of "neon board;" a notebook that had the name "Ahmad Al Ahmad" written on the front from the Mustansriyyah University Nuclear lab; a second notebook that had the name "Ahmad Al Ahmad" written on the front containing drawings of electrical circuits, circuit board designs, and formulas from the "Al Rafidayn" school. There was also a letter from 'Abd al Karim 'Amur to Ahmad Ibrahim Al Ahmad; documents containing technical notes and lessons (on an "Al Ahmad Electronics Industries" notebook) detailing electrical and electronic circuits, automotive sensors and wiring, batteries, frequencies, math calculations, current and voltage,

5

and various electronic components; documents also included emails, sales receipts, letters, and personal statements; an electronics booklet describing how to employ remote control technology to command a mobile phone, wireless device, and land line phone to detonate explosives.

13.     As part of the investigation, an analysis determined that materials of the kind seized at the Omar Cache were associated with IED attacks where U.S. Forces incurred casualties. For example, two attacks which were caused by RCIED initiators using a DTMF 11 custom circuit and a mobile phone are linked to the materials found in the Omar Cache. One incident used an initiator circuit that matched circuits recovered from the Omar Cache. The other incident used a circuit that is very similar to those found in the Omar Cache. On April 6, 2007, in the outskirts of southern Baghdad, near Baghdad International Airport, three U.S. soldiers were killed in action by a cellular phone initiated IED. The IED initiator used in this incident includes a DTMF 11 custom circuit that matched three circuits recovered in the Omar Cache. The circuits all have nearly identical traces, share a common set of electrical components, and function identically. Furthermore, the circuits were likely manufactured using the same processes. On May 14, 2007, in northern Baghdad, approximately one-half mile from the Omar Street facility, one U.S. soldier was killed in action and four wounded in action by a cellular phone initiated IED. The IED electronic switch used in this incident included a DTMF 11 custom circuit that was very similar to three custom circuits recovered in the Omar Cache. The custom circuits had subtle differences in their trace layouts, but otherwise used a common set of components and functioned identically.

14.     During a custodial interview, W-1, a cooperating witness who has agreed to testify, provided the following information about Al-Ahmad. W-1 was shown a photograph of Al-Ahmad, whom he identified as "Ahmad." W-1 indicated he met Al-Ahmad approximately six times, always in Baghdad, even though Al-Ahmad was originally from Syria. W-1 stated that in 2007, Al-Ahmad relocated to China, via Syria, with his wife and child. W-1 stated that while in China, Al-Ahmad designed DTMF boards to remotely detonate IEDs and commissioned a Chinese factory to manufacture them. Al-Ahmad told W-1 that he had designed the DTMF

6

boards, and that he was selling them solely to the 1920 Revolution Brigades to assist in the resistance against American Forces. W-1 acknowledged that Al-Ahmad was aware the DTMF boards were being used in IEDs against Americans. Al-Ahmad told W-1 he "would do anything against Americans." W-1 explained the DTMF boards shipped by Al-Ahmad did not have any other purpose, or commercial value, other than being used to detonate IEDs. W-1 advised he had seen a DTMF board early in 2007, when Al-Ahmad showed one to 1920 Revolution Brigades' members.

15.     The 1920 Revolution Brigades (Kataib Thawrat al Ishreen) ("the Brigades") is an armed Iraqi resistance group that opposes foreign occupation in Iraq. During the height of the group's operational activities from approximately 2003 to 2007, the Brigades was among one of the most prominent jihadist groups in Iraq.

16.     On September 6, 2007, the Brigades announced that they joined eight other like minded Iraqi armed factions in forming a unified front against the U.S. led coalition under the name of "Jihad and Change Front (JACF)." From its inception to present day, the Brigades'/JACF's objective of resisting what they view as the "U.S. occupation" has translated into a campaign of violent hit and run attacks against U.S. forces by the Brigades and attempts to sway public opinion against the U.S. through negative media reports generated by the Brigades'/JACF's media wings. Press statements published by the Brigades reflect the group's use of Improvised Explosive Devices (IEDs) to target U.S. military vehicles and dismounted foot patrols; the use of mortars, rockets, and missiles to shell U.S. military bases and positions; and the use of snipers to shoot U.S. military personnel.

17.     According to its media wing, the Brigades claimed responsibility for approximately 230 IED attacks, 156 shelling attacks, 82 sniper and small arms attacks, and 45 non-specific attacks targeting U.S. military personnel from 2005 to 2010. In some instances these press statements were accompanied by video footage documenting the attacks. Many of these videos show dramatic attacks on U.S. military vehicles which likely resulted in casualties to U.S. military personnel.

18. Additionally, the investigation found contacts between Al-Ahmad and other individuals who were members or associates of the 1920 Revolution Brigades primarily located in Iraq and Syria. Many of the contacts involved Al-Ahmad supplying these individuals with components that could be used in the construction and operation of IEDs.

**Location and Identification Information**

19. Al-Ahmad has several passports (Syrian passport No. 004365665  Iraqi passport No. G2143019, issued on 15 July 2008). Those passports are attached to this affidavit as Attachment 1. Additionally, Al-Ahmad has a number of aliases and dates of birth to include:

    a. ALAHMEDALABDALOKLAH, f/n Ahmed;

    b. FARHAN, f/n Ahmed Hassan;

    c. IBRAHIM, f/n Ahmad;

    d. EBRAHIM, f/n Ahmad;

    e. FARHAN, f/n Ahmed Hassan (born 7 April 1975);

    f. ALAHMEDALABDALOKLAH, f/n Ahmed (born 1 January 1977); and

    g. ALAHMEDALABDALOKLAH, f/n Ahmed (born 10 January 1977).

20. A photograph of Al-Ahmad is attached as Attachment 3 to this affidavit. Through my investigation, I am aware of Al-Ahmad's appearance and can attest that the photograph attached as Attachment 3 is a photograph of Al-Ahmad.

21. Al-Ahmad arrived in Istanbul, Turkey on May 17, 2011 on flight EK 121. He was, thereafter, arrested and is currently in the custody of Turkish authorities.

**List of Attachments**

22. The following attachments are incorporated into this affidavit by reference:

    Attachment 1 - Copies of Al-Ahmad's Syrian and Iraqi passports;

    Attachment 2 - Known thumb prints of Al-Ahmad;

Attachment 3 - Photograph of Al-Ahmad; and

Attachment 4 - Photographs of Omar Cache

_____
DINA L. MCCARTHY
Federal Bureau of Investigation, Special Agent

I hereby certify that this is the original affidavit subscribed and sworn to before me on this 26 day of May, 2011.

_____
HONORABLE MICHELLE H. BURNS
U.S. Magistrate Judge
U.S. District Court for the District of Arizona

9

# ATTACHMENT 1



رقم الجواز
Passport No.
Passport N°

N 00436 5665

وزارة الداخلية – إدارة الهجرة والجوازات
MINISTRY OF INTERIOR – DEPARTMENT OF IMMIGRATION AND PASSPORTS
MINISTÈRE DE L'INTÉRIEUR – DÉPARTEMENT DE L'IMMIGRATION ET DES PASSEPORTS

SYRIAN ARAB REPUBLIC
RÉPUBLIQUE ARABE SYRIENNE
الجمهورية العربية السورية

| | | |
|---|---|---|
| PASSPORT PASSEPORT | جواز سفر | |

| Type/Type: النوع | Country code/Code du pays: رمز البلد |
|---|---|
| P | SYR |

| | | |
|---|---|---|
| Issue no./N délivrance: | 001-08-0009969 | رقم الإصدار: |
| Given Name/Prénom: | AHMED | أحمد الإسم: |
| Surname/Nom: | ALAHMEDALABDALOKLAH | الأحمد العبد العكله اللقب: |
| Father Name/Nom du père: | EBRAHIM | إبراهيم إسم الأب: |
| Mother Name/Nom de la mère: | SUBHIEH | صبحية إسم الأم: |
| Birth Date/Date de naissance: | 01/10/1977 | تاريخ الولادة: |
| Birth Place/Lieu de naissance: | DEIR AZZOR | دير الزور مكان الولادة: |
| Sex/Sexe: | M | الجنس: |

PNSYRALAHMEDALABDALOKLAH<<AHMED<<<<<<<<<<<<<
0043656653SYR7710012M1011197<<<<<<<<<<<<<<08

الأقارب عند الحاجة
RELATIVES TO CONTACT WHEN NEEDED

الاسم / NAME

الجنسية / NATIONALITY

العنوان / ADDRESS

رقم الهاتف / TELEPHONE

توقيع حامل الجواز
SIGNATURE OF PASSPORT HOLDER

---

## REPUBLIC OF IRAQ

جمهورية العراق



PASSPORT جواز سفر   TYPE نوع   NO.   G2143019

AHMED HASSAN FARHAN

BAGHDAD - IRQ

1975-04-07   IRAQI   M

SANAA FADHIL

2006-07-14   2006-07-14

BAGHDAD

P<IRQFARHAN<<AHMED<HASSAN<FARHAN<<<<<<<<<<<<
G2143019<0IRQ7504079M1607141<<<<<<<<<<<<<<0N

**ATTACHMENT 2**



L THUMB

FCS191:09 7722
Nov 10

R THUMB

**ATTACHMENT 3**





**ATTACHMENT 4**

















**EXHIBIT E**

**Extension of Statute of Limitation for Certain Terrorism Offenses**
18 U.S.C. § 3286

. . . . .

(b)  No limitation.--Notwithstanding any other law, an indictment may be found or an information instituted at any time without limitation for any offense listed in section 2332b(g)(5)(B), if the commission of such offense resulted in, or created a forseeable risk of, death or serious bodily injury to another person.

18 U.S.C. § 2332b(g)(5)(B)

. . . . .

(g) Definitions.--As used in this section--

    (5) the term "Federal crime of terrorism" means an offense that--

. . . . .

       (B) is a violation of--

          (i) . . . . 2332 (relating to certain homicides and other violence against United States nationals occurring outside of the United States) . . . . 2339A (relating to providing material support to terrorists) . . . . of this title.